*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LINDA MOLITORIS,

      Plaintiff-Appellant,

v

SAINT MARY MAGDALEN
CATHOLIC CHURCH,

      Defendant-Appellee.

UNPUBLISHED
January 4, 2024

No. 364820
Livingston Circuit Court
LC No. 22-31366-NO

Before: GLEICHER, C.J., and SWARTZLE and YATES, JJ.

GLEICHER, C.J. (*concurring in part and dissenting in part*)

Linda Molitoris slipped and fell on black ice in a church parking lot, sustaining severe injuries. Since Molitoris was at the church to prepare meals for the needy rather than to enrich the church financially, Michigan law categorizes her as a licensee—a non-business visitor with consent to be on the premises. The majority correctly holds that because Molitoris was a licensee, the church was obligated to warn her only of hidden dangers creating an unreasonable risk of harm that the church knew about, and no direct evidence supports that it was aware of the black ice. And even if a duty to inspect the parking lot existed, my colleagues declare, the black ice did not present an unreasonable danger.

The majority's status-based description of the church's minimal duty of care conforms with Michigan law. But I cannot agree with the majority's determination that a parking lot sheathed in black ice is not unreasonably dangerous. That conclusion rests on obiter dictum from a case involving a fall from an icy roof, *Perkoviq v Delcor Homes–Lake Shore Pointe, Ltd*, 466 Mich 11, 19-20; 6443 NW2d 212 (2002) ("The mere presence of ice, snow, or frost on a sloped rooftop [off which a plaintiff falls] generally does not create an unreasonably dangerous condition."). According to the majority, Molitoris was obligated to anticipate the presence of black ice because she "has lived in Michigan for decades and readily understood on the evening of her fall that there could be ice in the parking lot on a cold day in February." Her intrinsic knowledge as a Michigander, the majority reasons, transformed the invisible black ice into a foreseeable danger.

In *Hoffner v Lanctoe*, 492 Mich 450, 463-464; 821 NW2d 88 (2012), our Supreme Court rejected the "prominently cited notion" that ice and snow hazards are "obvious to all" and automatically eliminate a jury-submissible premises liability case. Contrary to the majority and the *Perkoviq* dicta, snow and cold temperatures do not create an irrefutable presumption of accompanying ice. While "wintry conditions, like any other condition on the premises, may be deemed open and obvious," the question remains "whether the *individual* circumstances, including the surrounding conditions, render a snow or ice condition open and obvious such that a reasonably prudent person would foresee the danger." *Hoffner*, 486 Mich at 464 (emphasis added). Regarding invitees, "a premises owner has a duty to exercise reasonable care to diminish the hazards of ice and snow accumulation" by taking "reasonable measures" within a "reasonable time after an accumulation of ice and snow to diminish the hazard of injury to the invitee." *Id*. (quotation marks and citation omitted).[1]

This language instructs courts to apply a fact-specific analysis in ice cases rather than rubber-stamping a "wintry conditions" rule deeming every patch of ice on property open and obvious as a matter of law. Logically, there is no reason that a different rule should apply to licensees, even though a different standard of care applies. And in *Kandil-Elsayed v F & E Oil, Inc*, ___ Mich ___; ___ NW2d ___ (2023) (Docket Nos. 162907 and 163430), the Supreme Court explicitly jettisoned *Perkoviq*'s reasoning along with the standard of care approach to ice and snow hazards, holding that whether an invitee should have discovered an allegedly open and obvious danger "is relevant to the defendant's breach and the plaintiff's comparative fault[,]" *id*., slip opinion at 2. Questions of breach and comparative fault are almost always for a jury to resolve. "Rather than conduct a narrow analysis of whether an obvious danger . . . poses an 'unreasonable risk of severe harm,' " the Supreme Court decreed in *Kandil-Elsayed*, a "fact-finder should consider whether 'the possessor should anticipate the harm despite such . . . obviousness.' " *Id*., slip op at 43, quoting 2 Restatement Torts, 2d, § 343A, p 218 (second omission in original). "[W]hether a land possessor should anticipate harm from an otherwise open and obvious danger is a relevant inquiry under *breach*, not duty." *Id*.

That said, the *Kandil-Elsayed* majority also held that "the three traditional status-based categories—licensee, invitee, and trespasser—remain in effect, reserving the question of whether to adopt the Third Restatement's blanket reasonable-care standard for a later time."[2] *Id*., slip op at 39. This case is a poster child for jettisoning the status distinctions.

---

[1] This holding flowed from an earlier case, *Quinlivan v Great Atlantic & Pacific Tea Co, Inc*, 395 Mich 244, 261; 235 NW2d 732 (1975), in which the Supreme Court held that although an invitor does not guarantee an invitee's safety, "the invitor has a duty to exercise reasonable care to diminish the hazards of ice and snow accumulation." *Id*. This requires "that reasonable measures be taken within a reasonable time after an accumulation of ice and snow to diminish the hazard of injury to the invitee." *Id*.

[2] The Third Restatement of Torts eliminated status-based categories and created one general duty of care owed to anyone who entered a land possessor's property. See 2 Restatement of Torts, 3d, § 51, p 242.

Under current Michigan law, the church owed Molitoris no duty to even try to make the parking lot safe for her and her fellow volunteer meal-preparers. Yet had Molitoris slipped and fallen on black ice in the parking lot of the Marco's Pizza restaurant just down the road, a jury would decide whether the premises owner was liable for failing to remove or to warn of the danger. And had the victim of the church's black ice been a farmer selling vegetables to the church for use in the meals that Molitoris was preparing, the church would be liable for the farmer's injuries. Perhaps the moral of this story is that under Michigan's current premises liability law, no good deed goes unpunished.

Why has the obviously inequitable invitee-licensee distinction persisted in Michigan? Historically, these common-law distinctions "were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism*." Kermarec v Compagnie Generale Transatlantique*, 358 US 625, 630; 79 S Ct 406; 3 L Ed 2d 550 (1959). The United States Supreme Court explained in *Kermarec* that "modern common-law courts" have tinkered with the distinctions, creating "subclassifications" and delineating "fine gradations in the standards of care which the landowner owes to each." *Id*. Because these adjustments "produced confusion and conflict," the Supreme Court eliminated them in admiralty law, adopting "a single duty of reasonable care in all the circumstances." *Id*. at 631-632.

Many state courts followed suit in cases of premises liability. According to the jurisdictional vote count described in *Koenig v Koenig*, 766 NW2d 635, 640 (Iowa, 2009), "a bare majority of states have now departed from the original trichotomy in some fashion[.]"[3] The Iowa Supreme Court summarized in *Koenig* that abolishing the distinctions avoids "confusion," allowing for the use of "an easily applicable standard." *Id*. at 643-644. The *Koenig* Court reasoned that "[t]he difficulty in distinguishing between invitees and licensees underscores another disadvantage of the classification—people do not alter their behavior based on an entrant's status as an invitee or licensee." *Id*. at 644. *Koenig* underscored this observation by retelling a compelling hypothetical scenario developed by the West Virginia Supreme Court:

> A canvasser who comes on your premises without your consent is a trespasser. Once he has your consent, he is a licensee. Not until you do business with him is he an invitee. Even when you have done business with him, it seems rather strange that your duty towards him should be different when he comes up to your door from what it is when he goes away. . . . What is the position when you discuss business with him and it comes to nothing? No confident answer can be given to these questions. Such is the morass into which the law has floundered in trying to distinguish between licensees and invitees. [*Id*., quoting *Mallet v Pickens*, 206 W Va 145, 150; 522 SE2d 436 (1999).]

Despite the inconsistencies and the fundamental unfairness of the status distinctions, our Supreme Court unhesitatingly re-dedicated itself to continuing them in *Stitt v Holland Abundant*

---

[3] The "trichotomy" is the distinction between invitees, licenses, and trespassers. In this concurring opinion I limit my discussion to the invitee-licensee distinction.

*Life Fellowship*, 462 Mich 591, 604; 614 NW2d 88 (2000). *Stitt* announced a "quid pro quo" standard of care in premises liability cases, holding that

> the imposition of additional expense and effort by the landowner, requiring the landowner to inspect the premises and make them safe for visitors, must be directly tied to the owner's commercial business interests. It is the owner's desire to foster a commercial advantage by inviting persons to visit the premises that justifies imposition of a higher duty. In short, we conclude that the prospect of pecuniary gain is a sort of quid pro quo for the higher duty of care owed to invitees. Thus, we hold that the owner's reason for inviting persons onto the premises is the primary consideration when determining the visitor's status: In order to establish invitee status, a plaintiff must show that the premises were held open for a commercial purpose.

This rationale is merely an homage to feudalism, a system that allowed landowners to "act as they pleased within the confines of their own property." *Koenig*, 766 NW2d at 638.

"Perhaps the protection afforded to landowners by these rules was once perceived as necessary in view of the sparseness of land settlements, and the inability of owners to inspect or maintain distant holdings." *Smith v Arbaugh's Restaurant, Inc*, 469 F2d 97, 101; 152 US App DC 86 (1972). Judge David Bazelon observed in *Smith* that "[t]he prestige and dominance of the landowning class in the nineteenth century contributed to the common law's emphasis on the economic and social importance of free use and exploitation of land over and above the personal safety of those who qualified as trespassers or licensees." *Id*. Alternatively stated by the Massachusetts Supreme Court, "The feudal conception that the landowner was a sovereign within his own boundaries provided the justification for a line of decisions that predicated the existence and distinguished the degree of a landowner's liability for injuries occurring on his land on the type of relationship existing between the landowner and the injured party." *Mounsey v Ellard*, 363 Mass 693, 695; 297 NE2d 43 (1973).

Tort law has evolved considerably even since *Kermanrec*, *Smith*, and *Mounsey*, including in Michigan. The Michigan Supreme Court found our state's guest passenger statute unconstitutional in 1975, explaining that

> [t]o deny guests recompense for negligently inflicted injury, death or loss cannot be justified as a reasonable means to promote hospitality, foster gratitude, prevent collusion, perjury or fraud, reduce insurance premiums, or protect generous drivers from 'vexatious litigation' by ungrateful guests or conniving hitchhikers. [*Manistee Bank & Trust Co v McGowan*, 394 Mich 655, 681; 232 NW2d 636 (1975) (citation omitted).]

The doctrine of charitable immunity met the same fate in *Parker v Port Huron Hosp*, 361 Mich 1, 25; 105 NW2d 1 (1960). Historically, many rationales were advanced in support of charitable immunity; *Parker* discusses a sampling. *Id*. at 11-16. Akin to *Stitt*'s explanation for maintaining the distinctions between a landowner's duty toward invitees and licensees, charitable immunity rested in part on an economic protectionism theory: that charities' assets should be shielded from dissipation because they are funded by donations and serve worthy purposes. The policy

-4-

judgments at the center of *Stitt*, the guest passenger rule, and the charitable immunity doctrine exempt certain actors from the consequences of their carelessness, forcing the injured person to shoulder the economic and physical burdens. Two of these three harsh and discredited doctrines were discarded decades ago.

The common law of torts has moved toward a general standard of care grounded in reasonableness. See 1 Restatement Torts, 3d, § 7, comment *a*, p 77 (" . . . actors engaging in conduct that creates risks to others have a duty to exercise reasonable care to avoid causing physical harm.") The Third Restatement eliminates the categorical distinctions of premises liability law, explaining that "[a]t the time these status-based duties were developed, no general duty of care existed, and duties were based on relationships or specific activities. Thus, the status-based duties imposed on land possessors were consistent with basic negligence law and were the basis for imposing *any* duty on land possessors." 2 Restatement Torts, 3d, §51, comment *a*, p 242. "[T]he status-based duties for land possessors are not in harmony with modern tort law," the Third Restatement summarizes, rejecting them in favor of "a unitary duty of reasonable care to entrants on the land." *Id*.

The *Stitt* majority clung to an old rule rather than explaining why a social guest or a volunteer such as Molitoris is less worthy of the law's protection than someone who was on the land with a business purpose. General negligence principles should apply to her claim. This does not mean that the church that welcomed her as a volunteer is automatically liable for Molitoris's fall. Absent the application of the licensee rule, a jury may find that the black ice was unforeseeable, or that Molitoris was solely at fault. Churches and homeowners may purchase insurance (and undoubtedly Saint Mary Magdalen Catholic Church has done so) covering even gratuitous visitors. A system that promotes reasonable care across the board benefits landowners *and* visitors by treating all people alike, encouraging safety, and compensating the injured. I urge the Supreme Court to reconsider *Stitt* and to join the modern world of premises liability.

/s/ Elizabeth L. Gleicher